**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JEFFREY BYROADE, derivatively on behalf of GERON CORPORATION<br><br>Plaintiff,<br><br>v.<br><br>JOHN A. SCARLETT, KARIN EASTHAM, V. BRYAN LAWLIS, SUSAN M. MOLINEAUX, ROBERT J. SPIEGEL, DANIEL M. BRADBURY, and HOYOUNG HUH,<br><br>Defendants,<br><br>and<br><br>GERON CORPORATION,<br><br>Nominal Defendant. | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br><br>DEMAND FOR JURY TRIAL<br><br><br> Case No. |

Plaintiff Jeffrey Byroade ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of nominal defendant Geron Corporation ("Geron" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) as officers and/or directors of Geron for breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff bases his allegations on personal knowledge as to his own acts, and on information and belief as to all other allegations based upon investigation by counsel, including, but not limited to, a review and analysis of: (i) regulatory filings made by Geron with the U.S. Securities and Exchange Commission (the "SEC"); (ii) press releases issued and disseminated by Geron; (iii) a purported securities class action lawsuit filed in the United Stated District Court for the Northern District of California captioned *Junge v. Geron Corporation, et al.*, Case No. 3:20-cv-00547

(N.D.C.A.) (the "Securities Class Action"), alleging violations of the federal securities laws based on similar facts and circumstances as alleged herein; and (iv) other publicly-available information, including media and analyst reports, concerning Geron.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a stockholder derivative action that seeks to remedy wrongdoing committed by certain of Geron's officers and members of the Company's Board of Directors (the "Board") and their affiliates.  Plaintiff seeks to remedy the Individual Defendants'(defined below) violations of state and federal laws from November 3, 2016 through the present (the "Relevant Period") that have caused and continue to cause substantial monetary damages to Geron and other damages, including damages to its reputation and goodwill.

2.      Geron is a biopharmaceutical company with only drug product candidate.  In 2018, Geron had fifteen full-time employees and three part-time employees.

3.      During the Relevant Period, the Company was focused on the development of imetelstat, a telomerase inhibitor called for the treatment of hematologic myeloid malignancies like myelofibrosis ("MF") and myelodysplastic syndromes ("MDS").

4.      MF is a rare, chronic blood cancer in which excessive scar tissue forms in the bone marrow and impairs its ability to produce normal blood cells.  MF has the worst prognosis and poorest quality of life of all the chronic blood cancers.  MF causes severe debilitating symptoms, including an enlarged spleen (splenomegaly), which in turn causes pain and negatively affects white and red blood cell production, leading to anemia and increased risk of infection.  Other severe and debilitating symptoms that degrade quality of life include abdominal pain, fatigue, fever, weight loss, bone pain, and itching.  Because MF patients have severe disease burden and reduced quality of life, disease management is focused on the relief of symptoms and improvement

in quality of life.  Due to MF's severe debilitating symptoms, MF patients are not likely to undertake a treatment that does not substantially reduce these symptoms.

5.     In 2013, Geron disclosed the positive results of a pilot study of MF patients taking imetelstat that showed 39% of patients with enlarged spleens achieved reduction in spleen size of ≥50%, and symptom responses of ≥50% were observed in 77% of patients.  Further, 23% experienced a complete or partial remission, and another 18% experienced clinical improvements, for a total of over 40% of patients experiencing a complete or partial remission, or clinical improvement.

6.     In November 2014, capitalizing on the promising results from the pilot study, Geron entered into a collaboration and licensing agreement ("CLA") with Janssen Biotech Inc. ("Janssen"), a division of Johnson & Johnson, for the development of imetelstat for all indications in oncology, including MF, which resulted in a $35 million payment to Geron, with the potential for hundreds of millions more if imetelstat proved effective in treating MF.

7.     In 2015, the Individual Defendants and Janssen initiated the IMbark study.  Under the CLA, while Janssen was responsible for conducting the IMbark study, Geron shared expenses with Janssen and monitored the progress of the study and the data collected through the Joint Steering Committee ("JSC"), which consisted of both senior Geron and Janssen executives.

8.     As noted, patients with MF often have an enlarged spleen, so IMbark's co-primary endpoints sought to measure objectively whether imetelstat reduced spleen size.  These co-primary endpoints were selected by the Individual Defendants because they were the endpoints used by Incyte Corporation to gain approval for Jakafi (ruxolitinib), then the only FDA-approved drug for treating MF.

9.      IMbark was not a blinded study, therefore, members of the JSC, through periodic data reviews, had access to objective data that showed whether patients on imetelstat met the study's co-primary endpoints.  IMbark had fourteen secondary endpoints to measure other patient responses to imetelstat, including overall survival.  Overall survival was not selected as a primary endpoint because IMbark, as a Phase 2 study, did not have a control arm, and as a result, this endpoint was unreliable due to variability in patient selection and baseline patient health conditions, and as a result, could be biased and overstate or understate treatment efficacy.

10.     In October 2016, the last patient enrolled in IMbark, with approximately 100 patients enrolled in total. Patients in IMbark were followed for 24 weeks after their last treatment, which made objective data determining the proportion of patients that met the two co-primary endpoints available around April 2017.

11.     Nevertheless, the results of the IMbark study showed that imetelstat was not effective in improving quality of life because the vast majority of patients in the IMbark study had failed to meet the trial's co-primary endpoints at week 24.  In short, the results of IMbark showed imetelstat did not produce the robust efficacy outcomes seen in studies of Jakafi, or the unprecedented and durable results seen in the earlier pilot study of MF patients taking imetelstat.

12.     The material adverse results doomed Geron's partnership with Janssen because Janssen would decide whether to continue to license imetelstat based, in part, on the results of the two primary endpoints in the IMbark trial.  Following the JSC's review of the IMbark data in 2016 and 2017, instead of disclosing IMbark's material, adverse results, Geron's Chief Executive Officer ("CEO"), defendant John A. Scarlett ("Scarlett"), falsely stated that Geron observed "encouraging trends in the efficacy data" and "outcomes measures" that included "a range of spleen volume reductions" and "decreases in total symptom scores."

13. Nevertheless, instead of disclosing that the vast majority of patients in IMbark failed to meet the two primary endpoints, defendant Scarlett falsely stated that the IMbark data results reviewed in March 2018 "remain consistent with prior data reviews." This was not true, as the IMbark study data did not show "encouraging trends in the efficacy data" because the two primary endpoints, which were the most important clinical outcomes being studied in IMbark, were not met for the vast majority of IMbark study patients. Moreover, there were zero complete remissions.

14. Based on the data and work performed on IMbark, defendant Scarlett falsely represented that development of imetelstat had been "derisked," creating the misimpression that the data from the IMbark study showed imetelstat was effective in reducing spleen size and severe and debilitating symptoms, caused improved quality of life, and that the IMbark results weighed in favor of Janssen extending its licensing agreement. In truth, the data from the IMbark study showed imetelstat was not effective in reducing spleen size or reducing severe symptoms for the vast majority of patients, material facts that materially increased the risks attendant to the imetelstat program, rather than derisking the imetelstat program.

15. Finally, during the Relevant Period, the Individual Defendants (defined herein) negligently issued a materially false and misleading proxy statement urging stockholders to reelect the Individual Defendants under false pretenses.

16. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, Geron has sustained damages as described below.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n), and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.

18.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Geron is incorporated in this District.  In addition, the defendants have conducted business in this District, and the defendants' actions have had an effect in this District.

## PARTIES

22.     Plaintiff is a current stockholder of Geron common stock.   Plaintiff has continuously held Geron common stock at least since December 2004.

23.     Geron is a Delaware corporation with its principal executive offices located at 919 East Hillsdale Boulevard, Suite 250, Foster City, CA 94404.  Geron's Common stock shares trade on the Nasdaq Global Select market ("NasdaqGS") under the ticker symbol "GERN."

24.     Defendant Scarlett has served as CEO and a director of the Company since September 2011, as President since January 2012, and as Chairman of the Board since December 2018.  According to the Company's filings with the SEC, defendant Scarlett received $1,941,135 in compensation in 2019.

25.     Defendant Karin Eastham ("Eastham") has served as a director of the Company since March 2009.  She is Chair of the Audit Committee and a member of the Compensation Committee.  According to the Company's filings with the SEC, defendant Eastham received $169,412 in compensation in 2019.

26.     Defendant V. Bryan Lawlis ("Lawlis") has served as a director of the Company since March 2012.  He is a member of the Audit Committee and Compensation Committee. According to the Company's filings with the SEC, defendant Lawlis received $131,912 in compensation in 2019.

27.     Defendant Susan M. Molineaux ("Molineaux") has served as a director of the Company since September 2012.  According to the Company's filings with the SEC, defendant Molineaux received $121,912 in compensation in 2019.

28.     Defendant Robert J. Spiegel ("Spiegel") has served as a director of the Company since May 2010.  He is Chair of the Compensation Committee.  According to the Company's filings with the SEC, defendant Spiegel received $126,912 in compensation in 2019.

29.     Defendant Daniel M. Bradbury ("Bradbury") served as a director of the Company from September 2012 to June 2019.  He was a member of the Audit Committee during the Relevant Period. According to the Company's filings with the SEC, defendant Bradbury received $26,044 in compensation in 2019.

30.     Defendant Hoyoung Huh ("Huh") served as a director of the Company from September 2011 to December 2018.  According to the Company's filings with the SEC, defendant Huh received $245,357 in compensation in 2018.

31.     Defendants Eastham, Lawlis, and Bradbury are sometimes referred to herein as the "Audit Committee Defendants."

32.     Defendants Scarlett, Eastham, Lawlis, Molineaux, Spiegel, Bradbury, and Huh are sometimes referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual

Defendants owed the Company and its stockholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.     In addition, as officers and/or directors of a publicly-held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

36.     To discharge their duties, the officers and directors of Geron were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Geron were required to, among other things:

a.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.      conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

37.     Each of the Individual Defendants, as an executive officer and/or director, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to

9

the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

38.    According to the Company's Corporate Governance Guidelines, the Board members, and therefore the Individual Defendants, are required  "to perform his or her duties in good faith, in a manner he or she reasonably believes to be in the best interests of the Company and its stockholders, and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances."

39.    The Company also maintains a Code of Business Conduct (the "Code").  The Code sets forth legal and ethical standards of conduct for directors, officers, employees, and consultants of Geron and its subsidiaries.

40.    According to the Code, the employees and directors of Geron are responsible for helping Geron maintain its good reputation and the trust and confidence of its stockholders, its employees, the public, and those with whom Geron does business.

41.    Pursuant to the Code:

**COMPLIANCE WITH LAW**

Geron and its employees are subject to various Federal and state laws and regulations.  Some of them apply to everyone or to all companies; others apply to us because the Company issues publicly traded securities, or because we are developing therapeutic products, or because we use potentially hazardous substances in our operations.  Regardless of the source of the law or regulation, everyone at Geron is obligated to comply at all times and in all respects with all applicable laws and regulations.

*       *       *

**Insider Trading and Fair Disclosure**

Employees at Geron are likely to possess information about the Company (or about another company) that is not known to the general public and that is "material:" that is, if it were known to a reasonable investor it could affect the investor's decision to buy, sell or hold the Company's stock.  Federal and state laws prohibit trading in Geron stock or other securities while in the possession of material,

nonpublic information about the company whose stock is being traded.  They also prohibit "tipping" other people about such information so that they can trade, and selective disclosure of such information on behalf of the Company.  Geron employees must comply strictly with these prohibitions.  Geron's Insider Trading Policy provides more details about the policy and procedures for trading Geron stock.

**Accounting and Disclosure Controls**

Federal law obligates Geron to disclose certain information about its activities in reports filed with the Securities and Exchange Commission (the SEC).  Those reports, which may include the Company's financial statements, must be complete and accurate.  Under the direction of the Chief Executive Officer (CEO) and Chief Financial Officer (CFO), the Company has designed a set of internal controls and disclosure controls to ensure that all material information about the Company is reported to the appropriate Company officers so that it can be reflected, if appropriate, in the Company's SEC filings, and that all our financial reports are complete, accurate, and reliable.  All Geron employees must comply with those internal controls and disclosure controls and with the requirements of applicable accounting and auditing standards.  That includes promptly reporting to his/her supervisor any significant event or occurrence (whether positive or negative) that arises in the course of the employee's work.  It also includes reporting immediately to the Controller, the CFO or the CEO any actual or suspected breaches or violations of the Company's internal controls or any actual or suspected fraudulent or questionable transactions or occurrences (e.g., embezzlement, forgery or alteration of checks and other documents, theft, misappropriation or conversion to personal use of Company assets, and falsification of records).  Employees are also encouraged to bring to the attention of any Company officer any changes that may improve the Company's system of internal controls or disclosure controls.

*       *       *

**Federal Regulations**

The Company's product candidates and operations are subject to extensive and rigorous regulation by the U.S. Food and Drug Administration (the FDA).  The FDA regulates many areas of the Company's operations, including the research, preclinical and clinical testing, and development of our drug products; the submission of data and other information to support FDA approval; the manufacturing, testing, storage and labeling of our drug products; and the promotion, distribution, and sale of drug products (including the provision of drug samples to physicians); and the reporting of adverse events and other information to the FDA.  The FDA also regulates the export of drug products manufactured in the U.S. to international markets.  Violation of these laws and regulations can result in severe civil and criminal penalties, adverse publicity for the Company, total or partial suspension of production of a Company product, withdrawal of a Company

product from the market, and disciplinary action by the Company against the responsible individuals, up to and including termination of employment.

*       *       *

**ETHICS ABOVE ALL**

Ethical conduct in all things is an essential part of Geron's values.  In addition to complying strictly with laws, regulations, and policies, all Geron employees are expected to behave ethically at all times.  Everyone at Geron should take seriously any question of ethics of Company activities presented in good faith by any employee.  No employee will be required to act in a way that he/she, after serious consideration and discussion, finds to be unethical.

42.     The Company also maintains a document titled the Corporate Governance Guidelines (the "Guidelines") "to assist the Board in its exercise of its responsibilities and to serve the interests of the Company and its stockholders."  The Guidelines state:

**Role of the Board and Management**
The Board's primary role is to oversee Company management and to assure that the long-term interests of the stockholders are being served.  The Board is responsible for the oversight of the Company's business conducted by its employees, managers and officers under the direction of the CEO.  Both the Board and management recognize that stockholders' long-term interests are advanced by responsibly addressing the concern of other stakeholders essential to the Company's success, including patients, physicians, clinicians, collaborators, scientists, employees, vendors, the communities in which Geron does business and the government.

**Director Responsibilities**
The business and affairs of the Company will be managed by or under the direction of the Board, including through one or more of its committees as set forth in the Bylaws and committee charters.  Each director is expected to spend the time and effort necessary to properly discharge his or her responsibilities.  These include (as applicable):

1) overseeing the conduct of the Company's business to evaluate whether the business is being properly managed;

2) reviewing and, where appropriate, approving the Company's major financial objectives, plans, strategies and actions;

3) reviewing and approving long-term strategic and business plans and overseeing execution and evaluating results of such plans;

4) reviewing and, where appropriate, approving major changes in, and determinations of other major issues respecting the appropriate auditing and accounting principles and practices to be used in the preparation of the Company's financial statements;

5) reviewing and, where appropriate, approving major changes in, and determinations under, these Guidelines, the Code of Conduct and other Company policies;

6) reviewing and, where appropriate, approving actions to be undertaken by the Company that would result in a material change in the financial structure or control of the Company, the acquisition or disposition of any business(es) or asset(s) material to the Company or the entry of the Company into any major new line of business;

7) nominating directors, reviewing the structure and operation of the Board and overseeing effective corporate governance;

8) reviewing the performance of the Chief Executive Officer and other members of management based on reports from the Compensation Committee;

9) overseeing the assessment of major risks facing the Company and reviewing options for their mitigation;

10) reviewing information provided by the Company's Chief Executive Officer, Chief Financial Officer and General Counsel (collectively, the "Disclosure Committee"), regarding all material communications (oral and written) with the United States Food and Drug Administration ("FDA");

11) reviewing annual reports provided by the Disclosure Committee, directly or through the Audit Committee, regarding the effectiveness of the Company's internal control over financial reporting and, if appropriate, the Company's disclosure procedures for drug approval, manufacturing and marketing efforts, and material communications between the Company and regulatory agencies;

12) planning for succession with respect to the position of the Chief Executive Officer and monitoring management's succession planning for other key executive officers;

13) receiving quarterly reports from Company representative(s) sitting on the steering or similar committees created by the Company in connection with any material collaboration and license agreements;

14) meeting with the Company's General Counsel at least annually to receive a report on the status of every whistleblower complaint, if any, received by the Company in the preceding 12-month period; and

15) ensuring that the Company's business is conducted with the highest standards of ethical conduct and in conformity with applicable laws and regulations.

43. In addition, the Company's Audit Committee is specifically tasked with the Board's oversight responsibilities. The conduct of the Audit Committee is governed by the Audit Committee Charter (the "Charter").

44. Pursuant to the Charter:

The purpose of the Committee is to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company. The Committee shall assist the Board in fulfilling its oversight responsibilities relating to: the integrity of the financial statements and other information provided by the Company to any governmental body, regulatory agency or the public; the Company's system of internal controls regarding finance, accounting, financial reporting and public disclosures; the Company's compliance with legal and regulatory requirements and with ethics policies that management and the Board have established; the qualifications, independence, and performance of the Company's independent registered public accounting firm ("independent auditors"); and the Company's accounting and financial reporting processes generally. Consistent with this function, the Committee encourages continuous improvement of the Company's policies, procedures and practices at all levels.

\*     \*     \*

## IV. RESPONSIBILITIES AND DUTIES

In carrying out its responsibilities, the Committee will endeavor to ensure that the corporate accounting and reporting practices of the Company are in accordance with all regulatory requirements and are of the highest quality. While the Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Committee to plan or conduct audits or to determine that the Company's financial statements are complete and accurate and are in accordance with generally accepted accounting principles. Management is responsible for the preparation, presentation, and integrity of the Company's financial statements and for the appropriateness of the accounting principles and reporting policies that are used by the Company. The independent auditors are responsible for auditing the Company's annual financial statements and for reviewing the Company's unaudited interim financial statements. Absent actual knowledge to the contrary, each member of the Committee shall be entitled to rely on the integrity of those persons within the Company and of the professionals and experts (including the Company's independent auditors) from which the Committee receives information and, absent actual knowledge to the contrary, the accuracy of the financial and other information provided to the Committee by such persons, professionals or experts.

Further, auditing literature, particularly Public Company Accounting Oversight Board ("PCAOB") AU Section 722, "Interim Financial Statements", defines the term "review" to include a particular set of required procedures to be undertaken by independent auditors. The members of the Committee are not independent auditors, and the term "review" as used in this Charter is not intended to have the meaning set forth in PCAOB AU Section 722 and should not be interpreted to suggest that the Committee members can or should follow the procedures required of independent auditors performing reviews of financial statements.

In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention that is within the scope of the powers and responsibilities delegated to the Committee, with full access to all books, records, facilities, and personnel of the Company and the authority to obtain advice from and engage independent counsel, accounting and other advisers, as it determines necessary to carry out its duties. The Committee shall have the appropriate financial resources and authority to retain any independent counsel, experts or advisors (accounting, financial or otherwise) that the Committee believes to be necessary or appropriate. The Committee may also utilize the services of the Company's in-house legal counsel or other advisors to the Company.

The Company shall provide for appropriate funding, as determined by the Committee, for payment of (i) compensation to any independent auditors engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, (ii) compensation to any advisors employed by the Committee that it determines are necessary to carry out its duties and (iii) ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

The following shall be the principal duties and responsibilities of the Committee. These are set forth as a guide with the understanding that the Committee and/or the Board may supplement them as appropriate from time to time consistent with the Company's Bylaws.

1. Oversight of Independent Auditors. The Committee shall:

    A. In connection with each annual audit, discuss with the independent auditors and management, the overall scope of the audit, procedures to be followed and staffing of the audit.

    B. Be directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditors (including resolution of any disagreements between management and the independent auditors regarding financial reporting) for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attestation services for the Company, and the independent auditors shall report directly to the Committee.

C. Approve, in advance, all audit and non-audit services to be performed by the independent auditors. The Company shall not engage the independent auditors to perform the specific non-audit services proscribed by law or regulation. The Committee may delegate preapproval authority to a member of the Committee, provided that any decisions made by the delegate must be presented to the full Committee at its next scheduled meeting. Committee pre-approval of audit and non-audit services will not be required if the engagement for the services is entered into pursuant to pre-approval policies and procedures established by the Committee regarding the Company's engagement of the independent auditors, provided the policies and procedures are detailed as to the particular service, the Committee is informed of each service provided and such policies and procedures do not include delegation of the Committee's responsibilities under the Exchange Act to the Company's management. If the Committee elects to establish pre-approval policies and procedures regarding non-audit services, the Committee must be informed of each non-audit service provided by the independent auditors. Committee pre-approval of non-audit services (other than review and attest services) also will not be required if such services fall within available exceptions established by the SEC.

D. At least annually, review the independence and quality control procedures of the independent auditors and the experience and qualifications of the senior personnel of the independent auditors that are providing audit services to the Company. In conducting its review:

> (i) The Committee shall obtain and review a report prepared by the independent auditors describing (a) the internal quality control procedures of the independent auditors' firm and (b) any material issues raised by the most recent internal quality control review or peer review of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five (5) years, respecting one (1) or more independent audits carried out by the firm, and any steps taken to deal with any such issues.

> (ii) The Committee shall ensure that the independent auditors prepare and deliver, at least annually, a written statement delineating all relationships between the independent auditors and the Company, consistent with PCAOB Rule 3526, "Communications with Audit Committees Concerning Independence." The Committee shall actively engage in a dialogue with the independent auditors with respect to any disclosed relationships or services that, in the view of the Committee, may impact the objectivity and independence of the independent auditors. If the Committee determines that further inquiry is advisable, the Committee shall take appropriate action in response to the independent auditors' report to satisfy itself of the independent auditors' independence.

(iii)The Committee shall confirm with the independent auditors that the independent auditors are in compliance with the partner rotation requirements established by the SEC.

(iv) The Committee shall monitor whether the independent auditors' independence is maintained, including by reviewing the non-audit services provided to the Company by the independent auditors. Prohibited services under Section 10A(g) of the Exchange Act include: (a) bookkeeping or other services related to the accounting records or financial statements of the Company; (b) financial information systems design and implementation; (c) appraisal or valuation services, proving fairness opinions or preparing contribution-in-kind reports; (d) actuarial services; (e) internal audit outsourcing services; (f) management functions or human resources; (g) broker or dealer, investment adviser or investment banking services; (h) legal services and expert services unrelated to the audit; and (i) any other service that the PCAOB prohibits through regulation.

E. At least annually, discuss with the independent auditors the matters required to be discussed by Auditing Standard No. 16, Communications with Audit Committees, as adopted by the PCAOB (including any successor rule adopted by the PCAOB).

F. Set clear policies, in compliance with SEC regulations and NASDAQ Stock Market rules, for the Company's employment of employees or former employees of the independent auditors.

2. Review of Financial Statements. The Committee shall:

A. Review and discuss with the Disclosure Committee, prior to dissemination to the public, the Company's Forms 10-K, Forms 10-Q, earnings press releases, any earnings guidance provided to analysts and rating agencies, and other reports or financial information submitted to any governmental body or the public in connection with such financial information, including any certification, report, opinion, or review rendered by the independent auditors.

B. Review with the Disclosure Committee and the independent auditors the financial statements and disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations to be included in the Company's Forms 10-K or Forms 10-Q prior to filing, including their judgment about the quality and acceptability of the Company's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures, and the degree of aggressiveness or conservatism of the Company's accounting principles and underlying estimates. The Committee shall discuss the results of the annual audit or quarterly review and any other

matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards.

C. Following completion of the annual audit, review separately with management and with the independent auditors any significant difficulties encountered during the audit, including any restrictions experienced by the independent auditors on the scope of their work or access to required information. Among the items that the Committee should consider reviewing with the independent auditors are: (i) any accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise); (ii) any communications between the independent auditors' audit team and their national office with respect to auditing or accounting issues encountered during the audit; and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company. The Committee shall obtain assurances from the independent auditors that Section 10A(b) of the Exchange Act has not been implicated.

D. Review any significant disagreement among management, non-management employees and the independent auditors in connection with the preparation of the Company's annual financial statements and any related disclosures.

E. Receive quarterly updates regarding the Company's financial performance as compared to the Company's published financial guidance, if any, including the recommendations, if any, of senior management regarding whether the Company should revise its published guidance or release preliminary financial results.

F. Based on (i) the review and discussion referred to in paragraph 2(B) above, (ii) the disclosure received from the independent auditors regarding its independence and discussions with the independent auditors regarding such independence pursuant to paragraph 1(D)(ii) above, and (iii) the discussions with the independent auditors pursuant to paragraph 1(E) above, determine whether to recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year subject to the audit.

G. Prepare a report to be included in the Company's annual proxy statement, as required by SEC regulations.

H. Report the results of the annual audit to the Board. If requested by the Board, invite the independent auditors to attend the full Board meeting to assist in reporting the results of the annual audit or to answer other Board members' questions.

3. Review of Disclosure Matters.  The Committee shall:

A. Review processes utilized by the Company's management for annually assessing effectiveness of Disclosure Controls and Procedures (as defined in Rule 13a-15(e) of the Exchange Act) and performing quarterly certifications required for the Company's Forms 10-Q and Forms 10-K. Review management's report on its assessment of the effectiveness of internal control over financial reporting as of the end of each fiscal year and the independent auditors' report on the effectiveness of internal control over financial reporting.

B. Receive and review any disclosures from the Company's Chief Executive Officer and Chief Financial Officer made in connection with the certification of the Company's quarterly and annual reports filed with the SEC regarding: (1) significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial data; and (2) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

C. Review any significant changes in internal control over financial reporting.

D. Review any material weaknesses or significant deficiencies identified in internal control over financial reporting, as well as any remediation plan to address internal control deficiencies.

E. Receive an annual report from the Company's Chief Executive Officer, Chief Financial Officer and General Counsel (collectively, the "Disclosure Committee") regarding the effectiveness of the Company's internal control over financial reporting and, if appropriate, the Company's disclosure procedures for drug approval, manufacturing and marketing efforts, and material communications between the Company and regulatory agencies.

F. Meet, at least on a quarterly basis, with a member of the Disclosure Committee about concerns, if any, of the Disclosure Committee regarding disclosure issues, including whether there were any post-disclosure corrections to public statements that were recommended by the Disclosure Committee, the action taken in regard to each such recommendation, and for each recommendation not followed, the reason(s) for not following that recommendation.

4. Establishment and Oversight of Policies, Programs and Procedures.   The Committee shall:

A. Review with the Company's management and the independent auditors the results of their periodic analysis of significant financial reporting issues

and practices, including changes in accounting principles and disclosure practices.

B. Discuss with the independent auditors the regular reports that such auditors are required to make to the Committee regarding (i) the critical policies and practices of the Company, (ii) the alternative treatments of financial information that are within generally accepted accounting principles and that the independent auditors have discussed with management, and (iii) all other material written communications between the independent auditors and management of the Company, such as any management letter, management representation letter, reports on observations and recommendations on internal controls, independent auditors' engagement letter, independent auditors' independence letter, schedule of unadjusted audit differences and a listing of adjustments and reclassifications not recorded, if any.

C. Consider and approve, if appropriate, significant changes to the Company's auditing and accounting principles and practices as suggested by the independent auditors, management, or non-management employees.

D. At an appropriate time after the Committee has approved changes or improvements in financial or accounting practice, review with the independent auditors and management the extent to which such changes or improvements have been implemented.

E. To the extent not already established, establish regular and separate systems of reporting to the Committee by each of management and the independent auditors regarding significant judgments made in the preparation of the Company's financial statements and the view of each as to the appropriateness of such judgments.

F. Review with the independent auditors and management the adequacy and effectiveness of the Company's accounting, financial, disclosure and other controls, both internal and external, of the Company, including Company's legal and ethical compliance programs, and elicit any recommendations for the improvement of such internal control procedures or particular areas where new or more detailed controls or procedures are desirable.  Particular emphasis should be given to the adequacy of such internal controls to expose any payments, transactions, or procedures that might be deemed illegal or otherwise improper.

G. Discuss with management the Company's policies and procedures with respect to risk assessment and risk management.  The Committee shall consult with the General Counsel, or other senior-level Company employees, regarding the effectiveness of financial risk management, including significant financial and operation risk exposures and the actions management has taken to limit, monitor or control such exposures.

5. Review of Compliance.  The Committee shall:

A. Establish, review periodically and update as necessary a Code of Conduct (the "Code"), ensure that management has established a system to enforce the Code, and review management's monitoring of the Company's compliance with the Code.

B. Review the adequacy of and management's implementation and monitoring of the Company's internal control over financial reporting to ensure that the Company's financial statements, reports and other financial information disseminated to governmental organizations and the public satisfy legal requirements.

C. Oversee the Company's Insider Trading Compliance Program (the "Program"), including approval of any material updates to the Program, and receive a report, at least once annually, from the Company's General Counsel as the Company's Insider Trading Compliance Officer (the "Compliance Officer") regarding his or her monitoring of the Program. The Committee shall have regular access to the Compliance Officer, including the opportunity to meet with the Compliance Officer outside of the presence of any other senior executives of the Company.

D. Request assurances from management that the Company's foreign subsidiaries and foreign affiliated entities, if any, are in conformity with applicable legal requirements, including disclosure of related party transactions.

E. Review with the Company's General Counsel any legal matters that could have a significant impact on the Company's financial statements.

F. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

In addition to the foregoing, the Chair of the Audit Committee will receive reports from an independent, third-party supplier engaged by the Company to provide and monitor a whistle-blower hot line for Company employees and consultants, such as the NASDAQ OMX Whistleblower Hotline. The Chair will ensure that all anonymous whistleblower complaints are provided to the Company's General Counsel and that all complaints are completely and fully investigated by the Company's General Counsel, or a designated senior-level employee, in consultation with the Audit Committee. The Company's General Counsel must report to the entire Board at least annually on the status of every whistleblower complaint, if any, received by the Company in the preceding 12-month period.

G. Discuss with management any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process or accounting policies.

45.     In violation of the Charter, and their general duties as members of the Audit Committee, the Audit Committee Defendants conducted little, if any, oversight of the Company's internal controls or the Company's compliance with legal and regulatory requirements, resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such controls over reporting.  The Audit Committee Defendants' complete failure to perform their duties in good faith resulted in false misrepresentations to the SEC, the investing public, and the Company's stockholders.

46.     Each of the Individual Defendants further owed to Geron and its stockholders the duty of loyalty, which requires that each favor Geron's interest and that of its stockholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain a personal advantage.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

47.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the truth and further aided and abetted and assisted each other in breaching their respective duties.

48.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to:  (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and insider trading; (ii) conceal adverse

information concerning the Company's operations, financial condition, and future business prospects; (iii) artificially inflate the Company's stock price; and (iv) enhance the Individual Defendants' Company positions and their profits and power stemming from such positions.

49.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  The actions described herein occurred under the authority of the Board, thus each of the Individual Defendants who is a director of Geron was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

50.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of wrongdoing, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

51.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Geron and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND OF THE COMPANY

52.     Geron is a biotechnology company located in California that specializes in developing and commercializing therapeutic products for cancer treatment that inhibit telomerase.

53.     According to the Company's website, Geron has no product candidates other than imetelstat, and thus was and is entirely dependent on the success of imetelstat.  To be successful,

imetelstat needed FDA approval.  FDA approval for a new drug is generally a twelve to fifteen-year process with multiple stages, which are described below.

54.     In 2014, imetelstat was in early-phase clinical development for treatment of patients with MF and MDS.  MF is considered to be a chronic leukemia — a cancer that affects the blood-forming tissues in the body.  More specifically, MF is an uncommon type of bone marrow cancer that disrupts the body's normal production of blood cells.  MF causes extensive scarring in bone marrow, leading to severe anemia that can cause weakness and fatigue.  It can also cause a low number of blood-clotting cells called platelets, which increases the risk of bleeding.  MF often causes an enlarged spleen.

55.     Geron claimed that results of an early clinical "Pilot Study" indicated that imetelstat had a disease-modifying activity in MF, produced "unprecedented and durable" remissions, and provided evidence that imetelstat's mechanism of action inhibited growth of cancer cells.  Geron reported that in the pilot study, 39% of patients with enlarged spleens achieved reduction in spleen size of ≥50%, and symptom responses of ≥50% were observed in 77% of patients.  Furthermore, over 23% experienced a complete or partial remission, and another 18% experienced clinical improvements, for a total of over 40% of patients experiencing a complete or partial remission, or clinical improvement.  Defendant Scarlett described these results as "unprecedented" and "durable."

**THE JOINT DEVELOPMENT OF IMETELSTAT**

56.     On November 13, 2014, Geron and Janssen entered into a CLA, which granted Janssen the exclusive rights to develop and commercialize imetelstat worldwide for all indications in oncology, including MF.  In return, Geron received a $35 million upfront payment from Janssen

and was entitled for millions more, up to $900 million, for achieving certain developmental, regulatory, and commercial milestones and royalties from the sale of imetelstat.

57.     Geron and Janssen planned to develop imetelstat under a joint plan, which was expected to include Phase 2 studies in MF and MDS as initial studies, and additional registration studies in MF and MDS, and exploratory Phase 2 studies for treatment of related diseases. The joint plan aimed to begin the Phase 2 study in MF in mid-2015, followed by a Phase 2/3 MDS study. Under the CLA, Geron and Janssen were to split the development cost equally. Nevertheless, the CLA allowed Janssen to withdraw from jointly developing imetelstat with Geron if the development was not progressing as planned.

58.     Geron and its senior management, including Defendant Scarlett, were well aware of the joint development process of imetelstat. For example, Geron's Executive Vice President of Development and Technical Operations and Executive Vice President of Business Development and Portfolio & Alliance Management, who reported directly to defendant Scarlett, were members of the JSC. Together with Janssen's senior executives, the JSC oversaw and monitored the IMbark study, and reviewed the results and progress, including periodic reviews of IMbark study data, clinical, regulatory and safety data, results, reports, and analyses.

59.     As stated by defendant Scarlett on a conference call held with investors and analysts on November 14, 2014, the Company would play "an active role on the joint steering committee and other governance committees" and would participate "fully in the governance of the joint development and commercial efforts of the partnership over the life of the agreement." Defendant Scarlett also stated during a March 3, 2015 conference call with investors and analysts that:

> [W]e plan to continue to diligently represent Geron's interest on the imetelstat joint
> development committee and joint steering committee, as well as on several joint
> working groups, operating under the purview of the joint steering committee.
> Through these committees, our responsibilities [] include active review and

approval of all clinical studies, manufacturing plans and budgets, and leading the filing, prosecution, and maintenance of the imetelstat global patent portfolio. For example, work with Janssen is ongoing on the protocol for the new Phase II MF trial [IMbark].

60.    Likewise, two years later, during a May 9, 2017 conference call held with investors and analysts, defendant Scarlett further explained Geron's role in the joint development process of imetelstat, stating:

> So maybe I can help first by saying what does that Joint Steering Committee actually do, and the answer is that, that is the decision-making body that when we talk about things that have been decided. . . . the Joint Steering Committee which consists of senior Janssen executives and senior Geron executives . . . look at all the data and say yes, we agree. They usually are looking at the work of other subcommittees. They have multiple subcommittees that, if you will, report up to the Joint Steering Committee. . . . So anytime you see that the Joint Steering Committee has decided, determined, affirmed, whatever the words are, that means that Janssen is fully participated in that, fully agrees.

### THE IMBARK PHASE 2 STUDY

61.    On April 24, 2015, Janssen and Geron initiated the IMbark study for imelestat, a Phase 2 "Study to Evaluate Activity of 2 Dose Levels of Imetelstat in Participants With Intermediate-2 or High-Risk Myelofibrosis (MF) Previously Treated With Janus Kinase (JAK) Inhibitor". The IMbark study was designed to evaluate the activity of imetelstat in patients with high-risk MF who have relapsed after, or did not respond to other, treatment (refractory), and to evaluate the findings in the earlier pilot study. In July 2015, IMbark opened to patient enrollment.

62.    IMbark's co-primary efficacy endpoints measured whether imetelstat improved patient quality of life and alleviated symptoms—whether spleen volume and other debilitating symptoms were reduced. Spleen volume reduction is defined as the proportion of patients who achieve ≥35% reduction in spleen volume from baseline at the week 24 visit, which could be objectively measured by imaging scan. Total symptom reduction is defined as the proportion of

patients who have ≥50% reduction in total symptom scores from baseline at the week 24 visit, based on patient-reported severity of various symptoms associated with MF.

63.     Spleen volume reduction and reduction in symptoms were chosen as primary endpoints to measure the efficacy of imetelstat because they were used in connection with FDA approval of Incyte Corporation's Jakafi, which was the only FDA-approved drug for adults with certain types of MF at the time.  In the Phase 3 study data for Jakafi, 42% of patients achieved a greater than 35% reduction in spleen volume (compared to 1% of patients in a control group taking a placebo), and achieved high levels of statistical significance for improvement in severe and debilitating symptoms.  As described by defendant Scarlett during an April 10, 2017 conference call with investors and analysts, Geron and Janssen "chose these endpoints because the only precedent for regulatory approval in MF was developed from previous trials in which ruxolitinib [(Jakafi)], a JAK inhibitor, was used to treat front-line MF patients."

64.     IMbark's 14 secondary endpoints included complete remission or partial remission, and clinical improvement.  IMbark's fifth secondary endpoint was overall survival.  Overall survival was not selected as a primary endpoint because IMbark, as a Phase 2 study, did not have a control arm and overall survival may be unreliable due to variability in patient selection and baseline patient conditions, and may overstate or understate treatment efficacy.

65.     On September 12, 2016, during a conference call with analysts and investors, defendant Scarlett provided an update on IMbark based on an interim review of IMbark data. While defendant Scarlett declined to discuss specific data results, he described the data results as showing "encouraging trends in the efficacy data" that "were observed."  In response to an analyst question for details about the encouraging trends, defendant Scarlett responded:

> [W]e're not talking about the specifics of any of these results in terms of, you know, various outcomes and so forth.  We've always stated that we wouldn't be doing

that, we'd just be talking about outcomes of the trial.  So, I don't think I'm in a position to really make much more of a comment about that other than to say that obviously they were encouraging trends, you know, in progressing towards, you know, towards the assessment of the co-primary end points, [specifically] the symptoms reduction.  But beyond that, I don't think I would – I'm in a position to talk about that.

66.     Because spleen volume reduction and total symptom scores were measured after patients had been taking the drug for 24 weeks, and the last patient enrolled in IMbark in October of 2016, the objective data regarding the co-primary endpoints for all patients enrolled in IMbark, which showed that 90% of patients failed to experience a spleen volume reduction of ≥35%, 68% failed to experience an improvement in severe, debilitating symptoms of ≥50%, and that there were zero complete remissions, were available starting in or around April 2017.

67.     On April 10, 2017, during a conference call with analysts and investors, Defendant Scarlett discussed a second JSC internal review of IMbark data.  Defendant Scarlett stated that the JSC stated that "spleen volume response rate observed to date was less than that reported in frontline MF patients treated in trials with other drugs" but did not disclose any IMbark data or the material, adverse data results.  Defendant Scarlett, instead, falsely stated that "activity within multiple outcome measures was observed with imetelstat treatment, which suggests clinical benefit in this relapsed or refractory MF population.  These outcome measures included a range of spleen volume reductions, decreases in total symptom scores and improvements in hematologic parameters such as anemia and peripheral blood counts."

68.     In March 2018, the JSC conducted a third review of the IMbark data based on the data as of January 2018, over 64 weeks after the last patient enrolled in IMbark.  All of the patients in the IMbark study had taken imetelstat so the results were not "blinded," meaning that the JSC members could see overall spleen volume reduction and total symptom scores for patients who participated in IMbark.  The March 2018 review was reported to defendant Scarlett.

69.     The IMbark trial results indicated that imetelstat was not effective in treating MF and that it did not have a disease modifying effect.  Indeed, 90% of patients failed to experience a spleen volume reduction of ≥35, and 68% had failed to experience a reduction in debilitating symptoms of ≥50%.  Further, just one patient experienced a partial response and there were zero complete responses, for an overall response rate of just 1.7%, demonstrating that imetelstat did not have a disease modifying effect in contrast to the results of the earlier pilot study.

70.     The material, adverse results of IMbark based on the March 2018 review of the study data would be reflected in the draft and final minutes of the JSC.

71.     By April 2018, Janssen began conducting its primary analysis of the IMbark data. The timing of Janssen's decision whether to continue licensing imetelstat was determined by the completion of the primary analysis of IMbark, which Geron expected by September 30, 2018.

**THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS**

72.     During the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors materially adverse information about the IMbark study.  The Individual Defendants intentionally obscured and omitted this information from investors.

73.     On November 3, 2016, the Individual Defendants caused the Company to issue a press release announcing the Company's financial results for the quarter ended September 30, 2016 ("3Q16 Press Release").  The 3Q16 Press Release stated the following:

> In the third quarter of 2016, Janssen conducted planned internal reviews of initial data from IMbark[TM] and IMerge[TM],[1] the ongoing clinical trials of imetelstat.

---

[1] IMerge is a two-part clinical trial of imetelstat in transfusion dependent patients with Low or Intermediate-1 risk Myelodysplastic Syndrome, who have relapsed after or are refractory to prior

IMbark™ was designed to evaluate two dose levels of imetelstat (either 4.7 mg/kg or 9.4 mg/kg administered every three weeks) in approximately 200 patients (approximately 100 patients per dosing arm) with Intermediate-2 or High risk myelofibrosis (MF) who have relapsed after or are refractory to prior treatment with a JAK inhibitor.  The co-primary efficacy endpoints for the trial are spleen response rate and symptom response rate at 24 weeks.

Janssen's review included data from 20 patients from each dosing arm who had been followed on the trial for at least 12 weeks.  In this review, no new safety signals were identified and the safety profile was consistent with previous imetelstat clinical trials in hematologic myeloid malignancies.  Activity in the 4.7 mg/kg dosing arm did not warrant further investigation of that dose, and this arm has been closed to new patient enrollment.  In the 9.4 mg/kg dosing arm, even though at the week 12 data assessment an insufficient number of patients met the protocol defined interim criteria, this arm warranted further investigation because encouraging trends in the efficacy data were observed.  New enrollment in the 9.4 mg/kg arm has been suspended while the trial continues in order to obtain additional and more mature data that includes a longer follow-up of these patients at 24 weeks.

Enrolled patients in both arms are permitted to continue to receive imetelstat. Janssen has submitted a protocol amendment to health authorities that includes allowing eligible patients in the 4.7 mg/kg dosing arm to increase their dose to 9.4 mg/kg per investigator discretion.

Second internal data reviews of additional and more mature data from both trials are planned by the end of the second quarter of 2017

74.     On November 3, 2016, the Individual Defendants caused the Company to file a Form 10-Q with the SEC for the quarter ended September 30, 2016 ("3Q16 10-Q").  The 3Q16 10-Q contained similar comments highlighting the Company's CLA with Janssen, the IMbark trial, and the primary endpoints of spleen response rate and total symptom score at 24 weeks.  It also confirmed that "A primary analysis of the co-primary efficacy endpoints in IMbark™ is specified in the trial protocol to occur after all patients (planned to be approximately 100 enrolled and treated patients on the 9.4 mg/kg dosing arm) have been followed for at least 24 weeks."

---

treatment with an Erythropoiesis-Stimulating Agent. Plaintiff does not allege that the Individual Defendants made any materially false or misleading statements regarding IMerge in this action.

75.     On March 1, 2017, the Individual Defendants caused the Company to file a Form

10-K with the SEC for 2016 ("2016 10-K"), which was signed by all of the Individual Defendants.

The 2016 10-K contained similar comments highlighting the Company's CLA with Janssen, the

IMbark trial, and the primary endpoints of spleen response rate and total symptom score at 24

weeks.  The 2016 10-K did not disclose all of the IMbark study's secondary endpoints, focusing

only on: (i) complete remission or partial remission rate; (ii) clinical improvement rate; (iii)

anemia; (iv) spleen and symptom responses; and (v) safety.  The 2016 10-K also stated the

following, in relevant part:

> IMbark was initiated to assess the efficacy, safety and tolerability of two dose levels
> of single-agent imetelstat in patients with MF.  The trial was originally designed to
> enroll approximately 200 patients, including approximately 100 patients per dosing
> arm, with DIPSS intermediate-2 or high risk MF who have relapsed after or are
> refractory to JAK inhibitor treatment.  At the time of enrollment, patients must have
> measurable splenomegaly and symptoms of MF.  Patients were assigned randomly
> on a blinded basis in a 1:1 ratio to one of two dosing arms—9.4 mg/kg every three
> weeks or 4.7 mg/kg every three weeks.  Dose reductions for adverse events are
> allowed and follow protocol-specified algorithms.

> The co-primary efficacy endpoints for the trial are spleen response rate and
> symptom response rate.  Spleen response rate is defined as the percentage of
> patients who achieve $^3$35% reduction in spleen volume from baseline at the Week
> 24 visit, as measured by imaging scans and assessed at a central imaging facility
> and by an Independent Review Committee.  Symptom response rate is defined as
> the percentage of patients who have $^3$50% reduction in Total Symptom Scores from
> baseline at the Week 24 visit, based on patient-reported outcomes on a modified
> Myelofibrosis Symptom Assessment Form version 2.0 electronic diary.  Secondary
> efficacy endpoints include the number of patients achieving complete remission, or
> CR, or partial remission, or PR, clinical improvement, or CI, and anemia, spleen
> and symptom responses as assessed using the modified 2013 International Working
> Group for Myeloproliferative Neoplasms Research and Treatment, or IWG-MRT
> criteria, described in a 2013 Blood article.  These secondary endpoints will be
> assessed at the time of the primary efficacy analysis. Exploratory endpoints include
> cytogenetic and molecular responses, as well as leukemia-free survival.

> *          *          *

> We expect Janssen to conduct a second internal data review to assess potential
> future development, if any, of imetelstat in MF, as well as to assess whether 9.4
> mg/kg is the appropriate starting dose and is sufficiently efficacious and safe for

the IMbark patient population.  In the first quarter of 2017, Janssen initiated the process for the second internal data review for IMbark, which will include comprehensive analyses encompassing safety, efficacy, pharmacokinetic and pharmacodynamic data, as well as other exploratory assessments, such as cytogenetic and molecular data, from patients enrolled in the 9.4 mg/kg dosing arm who have been followed for at least 24 weeks, consistent with the co-primary efficacy endpoints.  Following the second internal review, we expect Janssen could decide to resume enrollment in the 9.4 mg/kg dosing arm, modify the trial, close the trial, discontinue development of imetelstat in MF, or terminate the Collaboration Agreement.  We expect the outcomes from the second internal data reviews for both IMbark and IMerge, regulatory considerations and the totality of other program information, including the evolving treatment landscapes in MF and MDS, to inform Janssen's decisions regarding future development plans for imetelstat.  We expect Janssen's decision-making regarding IMbark, the imetelstat program and the Collaboration Agreement to occur in the second quarter of 2017.  Janssen's decisions regarding future development plans for imetelstat, if any, may be subject to subsequent regulatory feedback.

The protocol-specified primary analysis of the co-primary efficacy endpoints in IMbark is planned to occur after all patients (i.e., planned to be approximately 100 enrolled and treated patients on the 9.4 mg/kg dosing arm) have been followed for at least 24 weeks.  Due to the current suspension of new patient enrollment in IMbark, the timing of the protocol-specified primary analysis for the trial is uncertain and may be substantially delayed due to numerous factors, including whether Janssen resumes patient enrollment in the trial, or may not occur at all if IMbark is terminated early based on preliminary data, safety concerns or for any other reason.

*       *       *

We have exclusively outlicensed imetelstat, which was our sole product candidate, to Janssen.  We are wholly dependent upon our collaborative relationship with Janssen to further develop, manufacture and commercialize imetelstat.  If Janssen fails to perform as required by the Collaboration Agreement or abandons the imetelstat program, the potential for us to generate future revenues from milestone payments and royalties from imetelstat would be significantly reduced, the development and/or commercialization of imetelstat could be terminated or substantially delayed, and our business would be severely harmed.

76.     On May 9, 2017, the Individual Defendants caused the Company to issue a press release announcing the Company's financial results for the quarter ended March 31, 2017 ("1Q17 Press Release").  In the section titled "Recent Company Events," the 1Q17 Press Release stated:

In April 2017, the second internal data reviews of IMerge and IMbark were completed.  Based on these reviews, the Joint Steering Committee determined the following:

● Both trials continue unmodified, and patients remaining in the treatment phases may continue to receive imetelstat.

● The safety profile of imetelstat in both trials was consistent with prior clinical trials of imetelstat in hematologic malignancies, and no new safety signals were identified.

● For IMbark, the current results suggest clinical benefit and a potential overall survival benefit associated with imetelstat treatment in relapsed or refractory MF. Enrollment of new patients to the trial remains suspended because the total number of patients enrolled to date is adequate to assess longer-term outcome measures, including overall survival, when the data are fully matured.

Geron expects further decisions by Janssen on the development of imetelstat will be informed by maturing efficacy and safety data from the trials, feedback from health authorities, and the totality of imetelstat program information, including an assessment of the evolving treatment landscapes in MDS and MF and the potential application of imetelstat in multiple hematologic malignancies.

77.     On May 9, 2017, the Individual Defendants caused the Company to file a Form 10-Q with the SEC for the quarter ended March 31, 2017 ("1Q17 10-Q").  The 1Q17 10-Q stated:

In these relapsed or refractory MF patients treated in the 9.4 mg/kg dosing arm, the spleen volume response rate observed to date was less than that reported in front-line MF patients treated in trials with other drugs.  However, activity within multiple outcome measures was observed with imetelstat treatment, which suggests potential clinical benefit in this relapsed or refractory MF patient population.  These outcome measures included a range of spleen volume reductions, reductions in Total Symptoms Score, and improvements in hematologic parameters, such as anemia and peripheral blood counts.  In addition, the data suggest there may be a potential overall survival benefit associated with imetelstat treatment in these patients.

*        *        *

During the next year, we expect Janssen to evaluate maturing efficacy and safety data from the IMbark trial, including an assessment of overall survival.  We expect the longer-term data from the trial, potential regulatory feedback, the totality of imetelstat program information, including an assessment of the evolving treatment landscape in MF and the potential application of imetelstat in multiple hematologic malignancies, including MDS, will inform Janssen's decision whether to continue development of imetelstat in relapsed or refractory MF.

78.     On August 9, 2017, the Individual Defendants caused the Company to file a Form

10-Q with the SEC for the six months and quarter ended June 30, 2017 ("2Q17 10-Q").  The 2Q17

10-Q stated:

> In April 2017, a second internal review of IMbark was completed, which included data from the approximately 100 patients who were enrolled in the trial, with each dosing arm analyzed separately.  Based on this second internal data review, the JSC determined the following:
>
> ● The safety profile was consistent with prior clinical trials of imetelstat in hematologic malignancies, and no new safety signals were identified.
>
> ● The data support 9.4 mg/kg as an appropriate starting dose for the relapsed or refractory MF patient population.
>
> ● In these relapsed or refractory MF patients treated in the 9.4 mg/kg dosing arm, the spleen volume response rate observed to date was less than that reported in front-line MF patients treated in trials with other drugs.  However, activity within multiple outcome measures was observed with imetelstat treatment, which suggests potential clinical benefit in this relapsed or refractory MF patient population.  These outcome measures included a range of spleen volume reductions, reductions in Total Symptoms Score, and improvements in hematologic parameters, such as anemia and peripheral blood counts.  In addition, the data suggest there may be a potential survival benefit associated with imetelstat treatment in these patients.
>
> The trial continues without any modifications, and patients remaining in the treatment phase may continue to receive imetelstat.  Enrollment of new patients to the trial remains suspended because the total number of patients enrolled to date is adequate to perform the protocol-specified primary analysis.  All safety and efficacy assessments will be conducted as planned in the protocol, which includes an assessment of a potential survival benefit associated with imetelstat treatment.  To date, median overall survival has not yet been reached in either dosing arm.  We also expect Janssen to perform an internal data review in the first quarter of 2018 to enable a potential protocol amendment to allow the long-term treatment and follow-up of patients, including for survival, beyond the current April 2018 per-protocol end-of-study date.

79.     On November 1, 2017, the Individual Defendants caused the Company to file a

Form 10-Q with the SEC for the nine months and quarter ended September 30, 2017 ("3Q17 10-

Q"). The 3Q17 10-Q stated:

> In July 2017, the JSC agreed that the timing of the protocol-specified primary analysis for IMbark will begin upon the earlier of either a pre-specified number of

deaths occurring in the trial or the end of the third quarter of 2018. Following completion of this primary analysis, which would include an assessment of potential survival benefit associated with imetelstat treatment, we expect Janssen to notify us of its Continuation Decision. We believe that without an adequate survival benefit in relapsed or refractory MF, Janssen would decide to discontinue the imetelstat program and terminate the Collaboration Agreement, irrespective of any other data from IMbark or from Part 1 of IMerge. Further, the primary analysis may not occur at all if IMbark is terminated early based on preliminary or ongoing data assessments, safety concerns or for any other reason, or placed on clinical hold or suspended by a regulatory authority for an extended period of time, under which circumstances Janssen must instead notify us of its Continuation Decision by the date that is approximately 24 months after the initiation of IMerge.

Separately, a data package, including information addressing the benefit-risk profile of imetelstat in relapsed or refractory MF, was submitted by Janssen in October 2017 in response to an information request received from the FDA for additional efficacy and safety data, including deaths, justifying continued treatment of patients enrolled in IMbark, and related interactions between Janssen and the FDA are ongoing.

\*     \*     \*

In addition to an assessment of potential survival benefit in relapsed or refractory MF, we expect continuing data from IMbark, including the internal data review expected in the first quarter of 2018, the protocol-specified primary analysis for IMbark, ongoing regulatory feedback, the totality of imetelstat program information, including an assessment of the evolving treatment landscape in MF and the potential application of imetelstat in multiple hematologic malignancies, including MDS, will inform Janssen's decision whether to continue development of imetelstat. Further delay in the timing of the Continuation Decision, or a negative Continuation Decision, which would result in termination of the Collaboration Agreement by Janssen, could increase our development costs and impair our ability to earn revenues from milestone payments or royalties under the Collaboration Agreement, any of which would severely and adversely affect our business and business prospects and the future of imetelstat.

80.     On March 16, 2018, the Individual Defendants caused Geron to issue a press release announcing the Company's financial results for 2017. The press release discussed the IMbark study and stated the following:

Janssen completed a third internal data review of IMbark in March 2018, based on a January 2018 data cut, to enable a protocol amendment to allow the long- term treatment and follow up of patients, including for survival, and the Collaboration's Joint Steering Committee (JSC) made the following observations and implemented the following actions:

• The safety profile was consistent with prior clinical trials of imetelstat in hematologic malignancies, and no new safety signals were identified.

• Outcome measures for efficacy, including spleen volume responses and reductions in Total Symptom Score remain consistent with the prior data reviews.

• With a median follow up of approximately 19 months, the median overall survival has not been reached in either dosing arm.

• The trial is officially being closed to new patient enrollment.  More than 100 patients have been enrolled in IMbark to date, which is expected to be adequate to assess overall survival.  Patients who remain in the treatment phase may continue to receive imetelstat, and until the primary analysis, all safety and efficacy assessments are being conducted as planned in the protocol, including following patients, to the extent possible, until death to enable an assessment of overall survival.

• Based on the rate of deaths occurring in the trial, the protocol-specified primary analysis, which includes an assessment of overall survival, will begin by the end of the second quarter of 2018.

• Upon the protocol-specified primary analysis, the main trial will be completed.  The IMbark protocol is being amended to establish an extension phase of the trial to enable patients remaining in the treatment phase to continue to receive imetelstat treatment per investigator discretion.  During the extension phase, standard data collection will primarily consist of safety information.

81.     On March 16, 2018, the Individual Defendants caused the Company to file a Form

10-K with the SEC for 2017 ("2017 10-K"), which was signed by all of the Individual Defendants.

The 2017 10-K stated:

Current Status of IMbark

In March 2018, Janssen completed a third internal data review of IMbark, based on a January 2018 data cut, to enable a protocol amendment to allow the long-term treatment and follow up of patients, including for survival, and the JSC made the following observations and implemented the following actions: . . .

• Outcome measures for efficacy, including spleen volume response and reductions in Total Symptom Score remain consistent with prior data reviews.

• With a median follow up of approximately 19 months, the median overall survival has not been reached in either dosing arm.

*          *          *

36

Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

. . . Janssen completed internal data reviews in September 2016, April 2017 and March 2018. In these data reviews, activity within multiple outcome measures was observed with imetelstat treatment that suggest potential clinical benefit in patients with MF who are relapsed after or refractory to prior treatment with a janus kinase, or JAK, inhibitor . . . ."

\* \* \*

● "if imetelstat fails to meet criteria determined by Janssen to support an affirmative Continuation Decision, or for any other reason, Janssen may discontinue the imetelstat program and terminate the Collaboration Agreement";

● "Even if Janssen obtains longer-term efficacy and safety data for IMbark, Janssen . . . may determine that such data do not show an adequate improvement in survival to support further development and potential regulatory approval for imetelstat in relapsed or refractory MF patients, which we expect would result in a decision by Janssen to discontinue IMbark and the imetelstat program and terminate the Collaboration Agreement";

● "Current clinical trials of imetelstat being conducted by Janssen, including IMbark . . . may fail to demonstrate sufficient safety and efficacy of imetelstat to warrant further development of the drug, which could prevent or further delay regulatory approval and commercialization of imetelstat"; and

● "the potential disease-modifying activity observed through molecular responses in the ET trial and partial or complete remissions observed in the Pilot Study may not be seen in current or future clinical trials of imetelstat."

82. During a March 19, 2018 conference call with investors analysts, defendant Scarlett

discussed the IMbark study data and the JSC's observations. Defendant Scarlett also stated:

This morning I'll start my remarks with a summary of the results from the latest internal data review conducted by Janssen on the IMbark, and an update on the projected timing of the protocol-specified primary analysis for IMbark and the subsequent potential continuation decision from Janssen. I'll then conclude with the status of the IMerge trial, including a recap of the data that was recently presented at the American Society for Hematology or ASH Annual Meeting, that was in last December.

As a reminder, IMbark is a Phase 2 clinical trial designed to test 2 doses of imetelstat, 9.4 milligrams per kilogram or 4.7 milligrams per kilogram, administered every 3 weeks in intermediate-2 or high-risk MF patients who are refractory to or have relapsed after treatment with the JAK inhibitor.

In reviewing the data, which was based on a January 2018 data cut, the collaboration's Joint Steering Committee, or JSC, made the following observations: first, the safety profile was consistent with prior clinical trials of imetelstat in hematologic malignancies and no new safety signals were identified; second, outcome measures for efficacy, including spleen volume responses and reductions in Total Symptom Score remain consistent with the prior data reviews; third, with a median follow-up of approximately 19 months as of the January 2018 data cut, the median overall survival has not been reached in either dosing arm.

Patients who remain on the treatment phase may continue to receive imetelstat, and until the primary analysis, all safety and efficacy assessments are being conducted as planned in the protocol, including following patients, to the extent possible, until death to enable an assessment of overall survival.

Upon the completion of the protocol-specified primary analysis, the main trial will be completed.

83.     Defendant Scarlett's representations that the IMbark data showed a potential improvement in overall survival compared to "real world data" were materially false and misleading because he did not disclose the negative data indicating that imetelstat did not improve quality of life, as 90% of patients failed to experience a spleen volume reduction of ≥35%, and 68% failed to experience an improvement in severe, debilitating symptoms of ≥50%.

84.     On March 27, 2018, defendant Scarlett attended the 17th Annual Needham Healthcare Conference in New York City. At the presentation, he introduced a slide titled "IMbark Internal Data Reviews, Findings to Date." The slide, which was also posted on Geron's website, purported to summarize "Internal data reviews completed by Janssen in September 2016, April 2017 and March 2018." It represented that "[a]ctivity within multiple outcome measures observed, suggesting clinical benefit in R/R MF" including a "[r]ange of reductions in spleen volume" and "[d]ecreases in Total Symptoms Score." The slide also stated "Median OS not reached in either dosing arm (with median follow-up of ~19 months at January 2018 data cut)." Nevertheless, defendant Scarlett's representations were materially false and misleading because Scarlett

concealed the material adverse result of the IMbark study and misrepresented the IMbark outcomes concerning the two key primary endpoints.

85.    The above statements in ¶¶ 73-84 were materially misleading because they failed to disclose: (a) that the IMbark study failed to meet its primary efficacy endpoints critical to measure the success of imetelstat; (b) that the overall survival rate in the IMbark study could not be meaningfully compared with other studies without providing the baseline disease characteristics of patients enrolled in the IMbark study; and (c) that, as a result of the foregoing, Janssen was reasonably likely to terminate its collaboration with Geron.

**THE TRUTH BEGINS TO EMERGE**

86.    On March 27, 2018, Adam Feuerstein, a veteran biotech journalist, published an article on *STAT News*, an online life sciences publication, titled "The top-performing biotech stock this year has surged on flimsy data."  In the article, Feuerstein questioned whether the Individual Defendants' statements about survival were intentionally misleading:

> Is a median overall survival of 19 months meaningful for these myelofibrosis patients?
>
> Yes, said Scarlett, even though the company's study lacks a control arm to compare against imetelstat for survival.
>
> Undeterred, Scarlett compared the survival update from Geron's imetelstat study to a separate analysis of "real world" myelofibrosis patient outcomes presented at a medical meeting by Janssen in 2016.
>
> For myelofibrosis patients who discontinued or no longer responded to Jakafi, median overall survival was seven months in the Janssen analysis, said Scarlett.
>
> That single data makes imetelstat look better.  But the rest of the study undermines his argument.
>
> Of the 430 myelofibrosis patients who received Jakafi as a first-line therapy (the patient group highlighted by Scarlett), only 15 percent went on to receive a second-line treatment with a different drug.  The other 85 percent of patients received no further treatment, suggesting they were too frail and close to death, according to the Janssen analysis.

Janssen also looked at myelofibrosis patients who received another treatment after Jakafi.  These patients lived a lot longer than seven months.

Sixty-three patients received Jakafi first and then a different second-line treatment. Their median survival was 14 months.  Another 49 patients started on Jakafi and then received Jakafi again.  Their median survival was 30 months.  Blended together, the median survival for these 112 patients was approximately 22 months.

By that comparison — which Scarlett did not mention last week — the 19-month median survival for imetelstat patients doesn't look as promising.

I asked Geron and Janssen to disclose the baseline disease characteristics of the 100 myelofibrosis patients enrolled in their Phase 2 study.  That information — easily shared without compromising the conduct of the study — would help investors better interpret the interim imetelstat survival data.

Both companies declined the request.

I also asked Geron and Janssen to explain why they've delayed by almost one year the disclosure of primary endpoint results from the Phase 2 study that would show, definitively, if myelofibrosis patients respond to treatment with imetelstat.

Again, they declined to share those data.

This is perhaps the most troubling aspect of the companies' behavior. Myelofibrosis drugs are approved based on their ability to shrink enlarged spleens and reduce overall disease symptoms.  These two efficacy measures are the co-primary endpoints of the imetelstat study, not survival, which is listed as the fifth secondary endpoint.

The last myelofibrosis patient to enroll in the Geron and Janssen study did so in October 2016.  The patients are treated with imetelstat for 24 weeks, which means spleen and symptom responses have been available to the companies since April 2017.

That's almost one year ago, so why haven't these results been disclosed publicly? "We are focused on survival in this myelofibrosis patient population," Geron spokesperson Anna Krassowska told me.

It's reasonable to assume Geron would be screaming from the biotech mountaintop had imetelstat showed meaningful disease activity in these hard-to-treat myelofibrosis patients.  (Something other companies developing competing drugs have done.)  Keeping those objective data under wraps — while focusing instead on a fuzzy survival talking point — is a significant red flag against imetelstat.

87.     Despite questions arising from industry experts, the Individual Defendants continued to mislead the public.  On May 10, 2018, the Individual Defendants caused Geron to

file a Form 10-Q with the SEC, which stated that, "the JSC concluded that as of January 2018, median follow up was approximately 19 months, and median overall survival had not been reached in either arm. Also, on May 10, 2018, the Individual Defendants caused the Company to issue a press release, which continued to fail to disclose the material adverse result of the IMbark study. The press release stated, in relevant part:

> "As we have previously announced, we expect Janssen to make its decision about whether to continue their development of imetelstat by the end of third quarter of 2018," said John A. Scarlett, M.D., Geron's President and Chief Executive Officer. "Regardless of Janssen's future decision, we believe imetelstat warrants further development because of the activity observed in lower risk MDS patients from Part 1 of IMerge as presented at ASH last December, and the evolving overall survival in relapsed or refractory MF patients observed in IMbark."

88.     The Individual Defendants continued to conceal the material adverse result of the IMbark study. For example, on July 31, 2018, the Individual Defendants caused the Company to file a Form 10-Q with the SEC ("2Q18 10-Q"), which contained similar comments highlighting the primary endpoints for imetelstat in the IMbark trial and that Geron and Janssen had amended the trial protocol to include an "assessment of overall survival." The 2Q18 10-Q did not discuss whether or not imetelstat had met its primary endpoints in the IMbark trial, nor was there any disclosure of imetelstat's numerical metrics with respect to either primary endpoint.

89.     On September 27, 2018, before the market opened, the Individual Defendants disclosed the material, adverse results of the IMbark study when they caused Geron to issue a press release, which stated:

### IMbark Protocol-Specified Primary Analysis Highlights

IMbark was designed as a Phase 2 clinical trial to evaluate two starting dose levels of imetelstat (either 4.7 mg/kg or 9.4 mg/kg administered by intravenous infusion every three weeks) in approximately 200 patients with Intermediate-2 or High-risk myelofibrosis (MF) who have relapsed after or are refractory to prior treatment with a JAK inhibitor.

41

The co-primary efficacy endpoints for the trial are spleen response rate, defined as the proportion of patients who achieve a ≥35% reduction in spleen volume assessed by imaging; and symptom response rate, defined as the proportion of patients who achieve a ≥50% reduction in Total Symptom Score, at 24 weeks.  Key secondary endpoints are safety and overall survival.

For the 9.4 mg/kg dosing arm (n=59), highlights from the primary analysis included a spleen response rate of 10% and a symptom response rate of 32%.  No patients achieved complete remission, and one patient achieved partial remission.  The safety profile was consistent with priorclinical trials of imetelstat in hematologic malignancies, and no new safety signals were identified.  The most common adverse events were cytopenias.  At the time of the primary analysis, median overall survival had not been reached after 23 months of median follow-up.

90.     The Individual Defendants also disclosed that Janssen had terminated its partnership to develop imetelstat.

91.     The same day the full results were finally disclosed, *STAT News* published a follow-up piece concerning Geron's disclosure.  The article stated, "Back in March, Geron CEO John Scarlett ignited a steep run higher in the stock price with a suggestion, uttered on a conference call, that imetelstat was prolonging survival in patients with the bone marrow disorder myelofibrosis."  The *STAT News* article characterized defendant Scarlett's conduct as a "bait-and-switch tactic."  The article further stated, "The Phase 2 study was designed primarily to determine if imetelstat could shrink spleens and improve myelofibrosis disease symptoms.  Geron and Janssen were keeping these data hidden, even though they were readily available.  Shifting attention to survival was a smokescreen.  On Thursday [September 27, 2018], we learned why.  The spleen response rate to imetelstat in the myelofibrosis study was a disappointing 10 percent."

92.     Following the disclosures of the truth, the price of Geron's common stock dropped from a closing price on September 26, 2018 of $6.23 per share, to $2.31 per share, a decrease $3.92 per share or over 62%, on massive trading volume of over 84 million shares. As a direct and proximate result of the Individual Defendants' actions as alleged above, Geron's market

capitalization has been substantially damaged, losing over $1.1 billion in value as a result of the conduct described herein.

**CERTAIN OF THE INDIVIDUAL DEFENDANTS ISSUED A MATERIALLY FALSE AND MISLEADING PROXY STATEMENT DURING THE RELEVANT PERIOD.**

93.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, defendants Scarlett, Eastham, Lawlis, Molineaux, Spiegel, Bradbury, and Huh (the "Proxy Defendants") also caused the Company to issue a false and misleading proxy statement during the Relevant Period.  The Proxy Defendants drafted, approved, reviewed, and/or signed a Form DEF14A before it was filed with the SEC and disseminated to Geron's stockholders on March 30, 2018 (the "2018 Proxy").  The Proxy Defendants negligently issued materially misleading statements in the 2018 Proxy.

94.     These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege nor sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

95.     The 2018 Proxy sought stockholder votes to, among others, elect defendants Scarlett and Spiegel for a three-year term.

96.     In support of the Proxy Defendants' bid to reelect defendants Scarlett and Spiegel, the Proxy Defendants highlighted their supposed oversight of the Company.  In particular, the 2018 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Geron faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.  The 2018 Proxy stated:

> The Board and our executive management team work together to manage our risks.
> It is management's responsibility to identify various risks facing the Company,

bring the Board's attention to material risks, and implement appropriate risk management policies and procedures to manage risk exposure on a day-to-day basis. The Board has an active role in overseeing our risk management process directly or through its committees.

The Board has delegated responsibility for the oversight of specific risks to the Board committees as follows:

- The Audit Committee oversees management of financial risks. In addition to fulfilling its responsibilities for the oversight of our financial reporting processes and annual audit of Geron's financial statements, the Audit Committee also reviews with the independent registered public accounting firm and the Company's management the adequacy and effectiveness of our policies and procedures to assess, monitor and manage fraud risk and our ethical compliance program. The Audit Committee takes appropriate actions to set the best practices and highest standards for quality financial reporting, sound business risk practices and ethical behavior.

- The Compensation Committee is responsible for overseeing the management of risks relating to our employment policies and executive compensation plans and arrangements. In connection with structuring the executive compensation program, the Compensation Committee, together with the Board, considers whether the elements of such program, individually or in the aggregate, encourage our Named Executive Officers to take unnecessary risks. For further information, see the sub-section entitled "Risk Assessment of Compensation Policies and Practices."

- The Nominating and Corporate Governance Committee manages Geron's corporate governance practices. In addition, the Nominating and Corporate Governance Committee reviews risks associated with the independence of the Board, potential conflicts of interest and risks relating to management and Board succession planning.

While each committee is responsible for evaluating certain risks and overseeing the management of such risks within its respective oversight area, the entire Board is regularly informed through committee reports about such risks.

\*       \*       \*

**AUDIT COMMITTEE REPORT**

The Audit Committee of Geron Corporation's Board of Directors is comprised of three independent directors as required by the listing standards of Nasdaq. The Audit Committee operates pursuant to a written charter that was last amended and

restated by the Board in November 2017. A copy of the Audit Committee's amended and restated charter is available on our website at www.geron.com.

The members of the Audit Committee are Ms. Eastham (Chairperson), Dr. Lawlis and Mr. Bradbury. The Board has determined that all members of the Audit Committee are financially literate as required by Nasdaq. The Board has also determined that Ms. Eastham and Mr. Bradbury are audit committee financial experts as defined by Nasdaq.

The function of the Audit Committee is to assist the Board in fulfilling its oversight responsibilities regarding:

(i) the quality and integrity of our financial statements,

(ii) our compliance with legal and regulatory requirements,

(iii) the qualifications and independence of the independent registered public accounting firm serving as our auditors and

(iv) the performance of the independent registered public accounting firm.

Management is responsible for Geron's internal controls and financial reporting. The independent registered public accounting firm is responsible for performing an independent audit of Geron's financial statements in accordance with generally accepted auditing standards and to issue a report thereon. The Audit Committee's responsibility is to monitor and oversee these processes.

In this context, the Audit Committee hereby reports as follows:

1) The Audit Committee has reviewed and discussed the audited financial statements of the Company as of and for the fiscal year ended December 31, 2017 with management and the independent registered public accounting firm serving as the Company's independent auditors.

2) The Audit Committee has discussed with the independent auditors the matters required to be discussed by Auditing Standard No. 1301 (Communication with Audit Committees) as adopted by the Public Company Accounting Oversight Board, other professional standards, membership provisions of the SEC Practice Session, and other SEC rules, as currently in effect.

3) The Audit Committee has received the written disclosures and the letter from the independent auditors required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent auditor's communications with the Audit Committee concerning independence, and has discussed with the independent auditors the independent auditor's independence.

4) The Audit Committee has considered whether the independent auditor's provision of non-audit services to the Company is compatible with maintaining the independent auditor's independence.

Based on the reports and discussions described above, the Audit Committee recommended to the Board that the audited financial statements be included in Geron's Annual Report on Form 10-K for the year ended December 31, 2017, for filing with the SEC.

97.     The 2018 Proxy, thus, assured stockholders that both the Individual Defendants and the Board members were involved with Geron's business strategy, actively monitored the Company's risks and exposures, followed good corporate governance practices, and acted in an ethical and legal manner.   In reality, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose: (a) that the IMbark study failed to meet its primary efficacy endpoints critical to measure the success of imetelstat; (b) that the overall survival rate in the IMbark study could not be meaningfully compared with other studies without providing the baseline disease characteristics of patients enrolled in the IMbark study; and (c) that, as a result of the foregoing, Janssen was reasonably likely to terminate its collaboration with Geron.

98.     As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Scarlett and Spiegel.

## DAMAGES TO THE COMPANY

99.     As a result of the Individual Defendants' wrongful conduct, Geron disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.   The improper statements have devastated Geron's credibility. Geron has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

100.    Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action.

101.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Geron's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

102.    Moreover, these actions have irreparably damaged Geron's corporate image and goodwill.  For at least the foreseeable future, Geron will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Geron's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

103.    Plaintiff incorporates the allegations herein by reference.

104.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

105.    Plaintiff is a stockholder of Geron, was a stockholder of Geron at the time of the wrongdoing alleged herein, and has been a stockholder of Geron continuously since that time.

106.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

107.    At the time of the filing of this complaint, the Geron Board consists of the following seven individuals: defendants Scarlett, Eastham, Lawlis, Molineaux, and Spiegel, and non-parties Dawn C. Bir ("Bir") and Elizabeth G. O'Farrell ("O'Farrell").

108.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.  Such a demand would have been a futile and useless act with respect to each and every one of the current members of the Board because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO THE INDIVIDUAL DEFENDANTS BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

109.     The Individual Defendants all face a substantial likelihood of liability for their individual misconduct.  Defendants Scarlett, Eastham, Lawlis, Molineaux, and Spiegel were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

110.     Moreover, as directors, defendants Scarlett, Eastham, Lawlis, Molineaux, and Spiegel owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, defendants Scarlett, Eastham, Lawlis, Molineaux, and Spiegel knowingly and/or recklessly allowed, made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.  These actions constitute breaches of the fiduciary duties of loyalty and

good faith, for which defendants Scarlett, Eastham, Lawlis, Molineaux, and Spiegel face a substantial likelihood of liability. Indeed, defendants Scarlett, Eastham, Lawlis, Molineaux, and Spiegel all signed the 2017 10-K with the SEC on March 16 2018, which failed to disclose that (a) the IMbark study failed to meet its primary efficacy endpoints critical to measure the success of imetelstat; (b) the overall survival rate in the IMbark study could not be meaningfully compared with other studies without providing the baseline disease characteristics of patients enrolled in the IMbark study; and (c) as a result of the foregoing, Janssen was reasonably likely to terminate its collaboration with Geron.

111.    If defendants Scarlett, Eastham, Lawlis, Molineaux, and Spiegel were to bring a suit on behalf of Geron to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to defendants Scarlett, Eastham, Lawlis, Molineaux, and Spiegel.

112.    Further, defendant Scarlett is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action. Additionally, defendant Scarlett is not independent because his principal source of income comes from his employment with Geron. In 2019 alone, defendant Scarlett received $1,941,135 from the Company in compensation, which amount is material to him. Indeed, Forms DEF 14A filed with the SEC admits that defendant Scarlett is not independent.

**DEMAND IS EXCUSED AS TO THE AUDIT COMMITTEE DEFENDANTS BECAUSE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

113.    As members of the Audit Committee during the Relevant Period, the Audit Committee Defendants participated in and knowingly approved the filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading

statements to the investing public.  More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to oversee and monitor the (a) integrity of the Company's financial statements, and (b) tCompany's compliance with legal and regulatory requirements.  Instead, the Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls, and compliance with legal and regulatory requirements, as required by the Charter.  For this reason, demand is futile as to the Audit Committee Defendants.

<u>**COUNT I**</u>
**VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT**
**(Against the Proxy Defendants)**

114.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

116.    The Proxy Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2018 Proxy.  In the 2018 Proxy, the Proxy Defendants solicited stockholder votes to reelect defendants Scarlett and Spiegel to the Board.

117.    The 2018 Proxy, however, misrepresented and failed to disclose, among others, the Board's risk oversight and the Company's inadequate internal controls which facilitated the illegal behavior described herein.  By reasons of the conduct alleged herein, the Proxy Defendants

violated Section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Geron misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect defendants Scarlett and Spiegel to the Board.

118.    Plaintiff, on behalf of Geron, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2018 Proxy in connection with the improper reelection of defendants Scarlett and Spiegel to the Board.

### COUNT II
**BREACH OF FIDUCIARY DUTY**
**(Against the Individual Defendants)**

119.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

120.    Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Geron's business and affairs.

121.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

122.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Geron.

123.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

124.    In addition, the Individual Defendants further breached their fiduciary duties owed to Geron by willfully or recklessly making and/or causing the Company to make false and

misleading statements and omissions of material fact and failed to disclose to investors that: (a) the IMbark study failed to meet its primary efficacy endpoints critical to measure the success of imetelstat; (b) the overall survival rate in the IMbark study could not be meaningfully compared with other studies without providing the baseline disease characteristics of patients enrolled in the IMbark study; and (c) as a result of the foregoing, Janssen was reasonably likely to terminate its collaboration with Geron.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

125.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

126.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

127.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

128.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Geron has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

129.    Plaintiff on behalf of Geron has no adequate remedy at law.

**COUNT III**
UNJUST ENRICHMENT
**(Against Individual Defendants)**

130.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Geron in the form of salaries, bonuses, and other forms of compensation.

132.    Plaintiff, as a stockholder and representative of Geron, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of Geron and that Plaintiff is a proper and adequate representative of the Company;

B.      Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.      Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

     D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

     E.     Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 10, 2020

Respectfully Submitted,

*/s/ Blake A. Bennett*
**COOCH AND TAYLOR, P.A.**
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, Delaware 19801
Telephone: (302) 984-3800
Email: bbennett@coochtaylor.com

*Attorney for Plaintiff*

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
Garam Choe
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (212) 355-4648